# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JANE DOE**, <br><br> Plaintiff, <br><br> *v.* <br><br> **THE HOSPITAL OF UNIVERSITY OF PENNSYLVANIA**, **et al.**, <br><br> Defendants. | **CIVIL ACTION** <br><br> **NO. 19-2881-KSM** |

## MEMORANDUM

**MARSTON, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　June 29, 2021

　　　　Plaintiff Jane Doe sued the Hospital of University of Pennsylvania ("HUP"), the Trustees of the University of Pennsylvania (the "Trustees"), the University of Pennsylvania ("Penn"), the University of Pennsylvania Health System ("Penn Health System"), Dr. Octavia Pickett-Blakely, Medical Personnel John Does 1–10, and Penn Police Officers Richard Roes 1–10, after receiving a colonoscopy at HUP and experiencing allegedly discriminatory treatment during her post-surgery recovery.  (Doc. Nos. 1 & 19.)  Doe, a transgender ("trans") woman and HUP employee, alleges that she has a sensitivity to anesthesia and became disoriented after her surgery, and that the Penn Police Officer Defendants restrained her, threw her into a wheelchair, handcuffed her, and wheeled her—topless—through the hospital.  (*Id.*)

　　　　Presently before the Court is Doe's Motion for Leave to File a Second Amended Complaint.  (Doc. No. 36.)  For the reasons discussed below, the Court denies Plaintiff's motion.

**I.　　Factual Background**

　　　　Accepting all allegations in the proposed Second Amended Complaint as true, the relevant facts are as follows.

Jane Doe is a transgender woman. (Doc. No. 36-1, Ex. D at ¶¶ 1, 40.) Doe has been diagnosed with gender dysphoria ("GD"). (*Id.* at ¶ 48.) According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, ("DSM-V"), GD is a diagnosis "'associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning' for the trans person." (*Id.* at ¶ 45.) In short, trans individuals are diagnosed with GD when they experience "clinically significant distress" associated with being trans. (*Id.* at ¶ 46.)

Doe was a Certified Nursing Assistant ("CNA") at HUP and was "out as a trans woman" at HUP. (*Id.* at ¶¶ 1–2.)

On February 20, 2018, Doe went to HUP as a patient for a routine diagnostic colonoscopy, which was performed by Dr. Pickett-Blakely. (*Id.* at ¶¶ 3, 61.) Doe's friend, Mary Roe, accompanied her to HUP that day. (*Id.* at ¶ 63.) They parked in Penn's garage and arrived at the reception desk around noon. (*Id.*) From that moment forward, Doe was misgendered.[1] (*Id.* at ¶ 65.) For example, when checking Doe in, the receptionist used Doe's old male name (i.e., her "dead name") and used masculine pronouns to refer to her. (*Id.*) The receptionist also advised Doe that she could not sign the medical paperwork with her female name; rather, she had to use her dead name. (*Id.*) Doe's identification ("ID") band also had her old name on it. (*Id.*)

When Doe was moved to the procedure area, providers and staff repeatedly used her male name. (*Id.*) This upset Doe so much that she grabbed a Sharpie pen out of her bag and wrote her female first name on the ID band. (*Id.*) "She was desperately trying to get them to stop . . . call[ing] her by her male first name and/or 'Mr.' and her last name." (*Id.*) Even though Doe did

---

[1] "Mis-gender means using the person's non-trans gender—the one they no longer use because they are trans." (*Id.* at ¶ 54.) In addition, "misgendering means using the wrong names and pronouns for the trans person." (*Id.* at ¶ 55.)

not cover any of the other information on her ID band, "the staff objected to her claiming her female identity" and attempted to remove the band from her wrist; Doe refused to allow them to do so. (*Id.*) Doe then learned that they had the wrong code for her procedure,[2] which increased her anxiety. (*Id.* at ¶ 67.)

Doe has a history of waking up scared, confused, and combative from anesthesia, and Doe and her friend Roe reminded the staff and providers of this aspect of her medical history. (*Id.* at ¶ 68.) In particular, Doe recalls making the admitting nurse, Dr. Pickett-Blakely (who performed the colonoscopy), Dr. Newman (the anesthesiologist), the transporting nurse, and the procedure staff aware of her sensitivity to anesthesia "and the plan for managing it." (*Id.* at ¶ 69.)

Before the procedure, Doe's fear and anxiety escalated, and she repeatedly asked the staff to "give her something for her anxiety," but no one treated her for it. (*Id.* at ¶ 70.) Doe brought a stuffed animal with her to the procedure to help alleviate her anxiety. (*Id.* at ¶ 71.) Doe recalls clutching the animal and being terrified as they anesthetized her. (*Id.*)

Doe does not recall the procedure itself. (*Id.* at ¶ 72.) However, she recalls waking up in the HUP recovery room in fear. (*Id.*) And even though Doe had asked that her stuffed animal and Roe be present in the recovery room with her when she woke up, neither was there. (*Id.*) Moreover, even when Doe stood for help, the staff and John Doe Defendants ignored her, and her disorientation grew worse. (*Id.* at ¶ 73.) For example, Doe did not know the time or where she was (*id.*), and she eventually stripped off her gown and stood completely naked (*id.* at ¶ 74).

---

[2] Defendants got the code wrong, despite the fact that Doe had previously alerted them to this issue. (*Id.* at ¶ 62.) On either February 15 or 19, Doe reviewed her upcoming procedure on her MyPennMedicine account and viewed the "appointments and visits" chart. (*Id.*) When she noticed the "Procedure" field had the wrong code, she called the Endoscopy Department to notify them. (*Id.*) The Endoscopy Department then assured her that it was corrected. (*Id.*)

Ultimately, Doe had a panic attack from post-sedation delirium. (*Id.* at ¶ 75.)

Typically, in a post-sedation delirium situation, the medically indicated procedures include hard restraints, medication, and re-intubation, if necessary. (*Id.* at ¶ 77.) In fact, Doe had previously used those procedures in her capacity as a CNA at HUP. (*Id.* at ¶ 78.) Nonetheless, Defendants did not use these procedures on Doe. (*Id.* at ¶ 79.) In short, they denied Doe medical treatment. (*Id.*)

Instead, a nurse in the recovery room called security. (*Id.*) Officers Nicholas Cattolico, Jenvoir Chin, Christopher Denschuick, John Alexander, and Nick DiPallo then arrived, entered the room, grabbed Doe, handcuffed her, and threw her into a wheelchair. (*Id.*) Because they had thrown her into the wheelchair sideways, her left arm was behind the chair, with her armpit over the handle. (*Id.* at ¶ 80.) One of the officers repeatedly sat on Doe, leaving her unable to breathe. (*Id.*) Doe recalls screaming that she could not breathe and struggling to get the officers to let up enough so that she could take another breath. (*Id.*) In addition, Doe remembers the handcuffs being very tight, resulting in her feeling extreme pain in her wrists and losing feeling in her fingers. (*Id.*) Doe felt "like she was about to die in that chair from their mistreatment." (*Id.*)

Doe also recalls one of the officers asking a medical staff member if they wanted to press charges and another officer taking "great joy dangling the handcuff keys" in front of her. (*Id.* at ¶¶ 80, 82.)

Cattolico, Chin, Denschuick, Alexander, and DiPallo then put Doe into pants, left her topless, shoeless, and handcuffed, and wheeled her away. (*Id.* at ¶ 81.) At this point, Doe was "still in a panic and now bruised and bloody from the treatment" she received at the hands of the officers. (*Id.*)

Once they arrived at the garage, where Roe was waiting with the car, Doe was brought out from the elevator bay, still without a shirt, a bra, or shoes on, and handcuffed. (*Id.* at ¶ 83.) The officers took the handcuffs off so that Doe could get into the car. (*Id.*) Doe was delirious and fearful and struggled to get into the passenger seat. (*Id.* at ¶¶ 83–84.) At this point, Roe took Doe to another medical institution for care for the physical injuries inflicted on her at HUP. (*Id.* at ¶ 85.) As a result of the incident, Doe's index finger had been broken and she suffered bruised ribs and a back injury, causing her pain. (*Id.*)

Afterwards, Doe's GD flared up and she experienced difficulty returning to HUP—which, again, was not only where the incident took place but also her place of employment. (*Id.* at ¶ 92.) In that vein, Doe has been unable to walk into a hospital since the incident without having flashbacks. (*Id.*)

Doe was unable to return to work the day after the incident—February 21, 2018, as she had planned to do. (*Id.* at ¶ 93.) The following week, February 28, 2018, Doe saw a medical provider, who gave her a note stating that Doe was "unable to work starting Feb 20, 2018 until medical clearance to return to work is granted." (*Id.* at ¶ 94.) Doe, in turn, provided the note to HUP. (*Id.*) On March 22, HUP's Disability Management Office received Doe's request for leave as a reasonable accommodation. (*Id.* at ¶ 95.) On April 6, HUP sent a letter to Doe granting approval of one more week of leave, to April 15, 2018. (*Id.* at ¶ 96.)

On April 12, shortly before her leave expired, Doe informed HUP that she would be requesting her ADA leave be extended for approximately another month and a half, until May 29, 2018. (*Id.* at ¶ 97.) On May 17, HUP notified Doe by letter that her leave would be granted until May 28. (*Id.* at ¶ 98.) HUP informed Doe that "operational needs preclude UPHS from continuing to hold your position for you beyond May 28, 2018" and that her position would be

filled if she did not return to work. (*Id.*) On June 7, HUP sent Doe another letter, this time stating that if Doe did not return on June 19, 2018, her employment would be terminated, effective immediately, and her position would be filled. (*Id.* at ¶ 99.) Doe did not return to work on June 19, and on June 26, HUP sent her a letter stating that because she did not return, her employment with Penn Health System was terminated. (*Id.* at ¶ 100.)

Doe claims there was never any discussion of reasonable accommodation for her disability and that Defendants acted with "transphobic hatred." (S*ee, e.g.*, *id.* at ¶¶ 96, 98–102.)[3]

Ultimately, Doe was unable to seek employment for months after the incident. (*Id.* at ¶ 106.)

A year later, on February 29, 2019, Doe wrote to the Commonwealth of Pennsylvania's then-Secretary of Health, Dr. Rachel Levine, for help. (*Id.* at ¶ 107.) The state initiated an investigation into HUP's treatment of Doe. (*Id.* at ¶ 108.) Lorena Renee Cromartie, MSN, BSN, RN—a Health Facility Quality Examiner Supervisor for the Department of Health's Bureau of Facility Licensure and Certification—led the investigation. (*Id.*)

On March 14, 2019, Cromartie provided Doe with a partial update and told her that HUP's Chief Medical Officer, Dr. Neil O. Fishman, admitted that "a number of [HUP's] internal

---

[3] With respect to transphobia, Doe asserts that Defendants' actions flouted their public policies regarding trans people. (*See generally id.*) According to Doe, Defendants promote their "LGBT Health Care" as a "Clinical Care Initiative" for trans people, "aiming to make Penn Medicine a leader" in "state-of-the-art clinical care" of trans patients. (*Id.* at ¶ 51 (internal citation omitted).) Defendants' website indicates that they understand that "[f]ear and stress caused by a trans hostile environment negatively impacts trans patient care"; that "LGBT individuals, and in particular transgender people, face provider level barriers and health system barriers to care"; that "[p]rovider level barriers to care include negative beliefs and actions toward trans patients and gaps in knowledge about the health concerns facing the trans population"; and that "[h]ealth system barriers to care include inequitable hospital/clinic policies and practices." (*Id.* at ¶ 52 (internal citation omitted). Further, Defendants' Penn Medicine Program for LGBT Health aims to become a leader by: including gender identity data on patients' medical charts; creating a "Transgender Buddy Program" to help transgender patients navigate the health system while minimizing risk of misgendering and educating providers. (*Id.* at ¶ 53 (internal citation omitted).)

processes have been reviewed and revised based on this incident." (*Id.* at ¶ 109.)

Nonetheless, Doe's medical records do not contain any reference to the February 20 incident; there was no acknowledgment of Doe's gender identity, name, or her anesthesia instructions in her records. (*Id.* at ¶¶ 110, 112.) Doe alleges that HUP and other individual Defendants falsified Doe's medical records and made errors as to the procedure notes. (*Id.* at ¶¶ 111, 113.) For example, Dr. Pickett-Blakely's notes state that during the procedure, an instrument "was introduced through the mouth," which is "wrong" since a colonoscopy is clearly not performed "through the mouth." (*Id.* at ¶ 113.)

## II.     Procedural History

On April 13, 2019, Doe filed charges of sex and disability discrimination with the Equal Employment Opportunity Commission ("EEOC").[4] (*Id.* at ¶ 29.) The EEOC issued a right to sue letter to Doe on May 13, 2019 (*id.* at ¶ 30), and on July 2, 2019, Doe initiated this action against HUP, the Trustees, Penn, Penn Health System, Dr. Pickett-Blakely, John Does 1–10, and Police Officers Richard Roes 1–10 (*see* Doc. No. 1.)

In her original complaint, Doe brought claims for assault, battery, intentional infliction of emotional distress ("IIED"), false imprisonment, violation of the right of privacy, and medical malpractice against all Defendants. (*Id.* (Counts I–VI).) Doe also claimed that all Defendants discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act ("Title VII"), and that all Defendants violated Title III of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. (*Id.* (Counts VII, XI & XII).) Further, Doe claimed that

---

[4] Doe alleges that Defendants disclosed Doe's confidential employment and health information, including HIPAA and other protected information, to the EEOC, in an attempt to breach her anonymity. (*Id.* at ¶ 117.)

HUP wrongfully terminated her and violated Title I of the ADA. (*Id.* (Counts VIII & IX).) Last, Doe alleged that the Trustees, Penn, and Police Officers Richard Roe 1–10 violated Title II of the ADA. (*Id.* (Count X).)

A few months later, on October 3, 2019, Doe filed an amended complaint. (*See* Doc. No. 19.) When she amended her complaint, Doe removed the medical malpractice claim against all Defendants and added claims for reckless conduct, gross negligence, and negligence against all Defendants. (*See id.* (Counts V–VII).) In sum, Doe brought the following claims against all Defendants: assault, battery, IIED, false imprisonment, reckless conduct, gross negligence, negligence, violation of the right of privacy, sex discrimination in violation of Title VII, violation of Title III of the ADA, and violation of the Rehabilitation Act. (*Id.* (Counts I–IX, XII–XIII).) In addition, Doe continued to assert claims against HUP for wrongfully terminating her and violating Title I of the ADA, but withdrew her claim that the Trustees, Penn, and Police Officers Richard Roe 1–10 violated Title II of the ADA. (*See generally id.*)

Shortly thereafter, on November 7, 2019, the Trustees, HUP, Penn Health System, and Dr. Pickett-Blakely (the "Penn Defendants") filed a partial motion to dismiss. (*See* Doc. No. 23.) Penn Defendants moved to dismiss Counts V (reckless conduct), VI (gross negligence), VII (negligence), VIII (violation of the right to privacy), IX (Title VII sex discrimination), XI (Title I of the ADA), XII (Title III of the ADA), and XIII (Rehabilitation Act).[5] (*Id.*) Doe opposed the

---

[5] In their motion, Penn Defendants first argued that Doe's negligence-based claims (i.e., the negligence, gross negligence, and reckless conduct claims) must be dismissed because they are merely medical malpractice claims in disguise and that Doe cannot circumvent the requirements for medical malpractice claim (namely, filing a certificate of merit) by renaming it. (*Id.* at pp. 8–11.) Second, Defendants argued that Doe's ADA and Rehabilitation Act claims should be dismissed because Doe failed to plead a limitation of a major life activity. (*Id.* at pp. 12–14.) Next, Defendants argued that Doe failed to adequately plead a privacy violation. (*Id.* at pp. 15–16.)

Defendants initially also argued that Doe's Title VII claim should be dismissed because the Third Circuit does not recognize protection for transgender employees under Title VII (see *id.* at pp. 14–15) but later

8

motion. (Doc. No. 25.)

Then, on February 27, 2020, this matter was reassigned from the Honorable Mitchell S. Goldberg to the Honorable Karen Spencer Marston. (Doc. No. 28.) This Court held a preliminary pretrial conference on March 13, 2020 (Doc. No. 30), and on March 16, issued a scheduling order (Doc. No. 31). Pursuant to the scheduling order, all motions to amend the complaint were due by March 30, 2020. (*Id.*) A footnote then explained, "Absent good cause shown, after March 30, 2020—and no later than May 13, 2020—the parties may amend their pleadings only to rename, add, or remove named parties in this case. Absent good cause shown, any motion to amend after March 30, 2020 may not alter the factual or legal allegations in the pleadings." (*Id.* at n.1.)

Nonetheless, on May 22, 2020[6]—*after* the March 30 deadline to move to amend the complaint had passed and *after* the May 13 deadline to move to amend for the limited purpose of renaming, adding, or removing named parties passed—Doe moved for leave to file a second amended complaint. (Doc. No. 36.) The proposed second amended complaint includes several changes, such as:

- Naming six additional defendants (who had previously been either Richard Roes or John Does):
    - Dr. Randolph Newman (anesthesiologist);[7]

---

withdrew this argument (*see* Doc. No. 24).

[6] On May 15, 2020, the Court held a telephonic status conference to discuss discovery disputes the parties had raised in correspondence to the Court. (*See* Doc. Nos. 34–35.) During this conference, Doe's attorney noted that she had health issues and difficulty communicating with her client. Doe's attorney had provided a copy of the Second Amended Complaint to Defendants' attorneys who stated that Defendants intended to oppose the filing of the Second Amended Complaint for a number of reasons, including that it was time barred.

[7] According to the Penn Defendants, the anesthesiologist is incorrectly identified. (*See* Doc. No. 38 at p. 2 ¶ 1.) Although Defendants provided his name as Randolph Newman, M.D. at the time of their initial disclosures (Doc. No. 36-1 at p. 64), Defendants now state that name is actual name is Dr. Norman

9

- - o   Nicholas Cattolico (HUP Security Officer),

  - o   Jenvoir Chin (HUP Security Officer),

  - o   Christopher Denschuick (Penn Police Officer),

  - o   John Alexander (Penn Police Officer), and

  - o   Nick DiPallo (Penn Police Officer).

- Adding allegations about the incident and Defendants.

- Adding ten counts of constitutional violations, all of which Doe brings under 42 U.S.C. § 1983:

  - o   For use of excessive force, in violation of the Fourth Amendment of the U.S. Constitution, against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Count VIII);

  - o   For use of excessive force, in violation of Doe's Fourteenth Amendment right to due process, against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Count IX);

  - o   For denial of medical care, in violation of Doe's Fourteenth Amendment right to due process, against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Count X);

  - o   For violation of Doe's Fourteenth Amendment right to privacy against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Counts XI & XII);

  - o   For inadequate training or supervision, in violation of Doe's Fourteenth Amendment right to due process, against the Trustees (Count XIII);

  - o   For state-created danger, in violation of Doe's Fourteenth Amendment right to due process, against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Count XIV);

  - o   For violation of the Fourteenth Amendment's Equal Protection Clause – Class of One, against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Count XV);

  - o   For sex discrimination, in violation of the Doe's right to equal protection under the Fourteenth Amendment, against Defendants Denschuick, Alexander, DiPallo, the Trustees, and Richard Roes 1–10 (Count XVI);

---

Randolph (*see* Doc. No. 38 at p. 2 ¶ 1), not Dr. Randolph Newman.  For purposes of this motion, we will refer to the anesthesiologist as Dr. Newman.

> > and
>
> > o For failure to intervene, in violation of Doe's Fourteenth Amendment right to due process, against all Defendants (Count XVII).
>
> - Reinstating the violation of Title II of the ADA count against the Trustees, Penn, and Police Officers Richard Roes 1–10 (Count XXI), which had been in the original complaint (*see* Doc. No. 1) and later withdrawn in the amended complaint (*see* Doc. No. 19).

(Doc. No. 36-1 at pp. 83–112.)

Penn Defendants oppose Doe's motion, arguing that:

- Doe has not shown good cause under Federal Rule of Civil Procedure 16 to modify the scheduling order;

- Doe's claims against Dr. Newman are time-barred and do not relate back to her original complaint;

- Doe cannot bring Title VII, ADA, or Rehabilitation Act claims against Dr. Newman because he is an individual;

- Doe cannot bring Fourteenth Amendment claims against Dr. Newman because he is not a state actor;

- Doe cannot assert employment or new constitutional claims against Dr. Pickett-Blakely;

- Doe cannot assert ADA Title II claims against any of the defendants; and

- Doe cannot assert new claims against the original defendants.

(Doc. Nos. 38 & 51.)

In addition, in their opposition brief, Penn Defendants argue that Doe's negligence, gross negligence, and reckless conduct claims must be dismissed because they are essentially disguised medical malpractice claims. (Doc. No. 38.) The Court notes, however, that the negligence, gross negligence, and reckless conduct claims are all currently encompassed in the operative complaint (*see* Doc. No. 19) and thus are not germane to the Court's analysis on Plaintiff's instant motion for leave to amend.

11

For the reasons discussed below, we will deny Plaintiff's Motion for Leave to File a Second Amended Complaint.

## III. Discussion

### A. *Legal Standard*

Generally, a motion to file an amended pleading is governed by Federal Rule of Civil Procedure 15. Federal Rule of Civil Procedure 15(a) allows a party to "amend its pleading once as a matter of course within 21 days after serving it, or . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," which should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). The burden is on the party opposing the amendment, and the "touchstone of the rule is a showing of prejudice" to the opposing party. *Price v. Trans Union, LLC*, 737 F. Supp. 2d 276, 279 (E.D. Pa. 2010). "In the absence of substantial or undue prejudice, denial [of a motion to amend] must be grounded in bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment." *Heyl & Patterson Int'l, Inc. v. F. D. Rich Hous. of the V.I., Inc.*, 663 F.2d 419, 425 (3d Cir. 1981). Federal Rule of Civil Procedure 15(c) is a "related" but "distinct provision," which "provides that an amendment arising out of the same conduct as that alleged in the original complaint will normally 'relate back' to the complaint for statute of limitations purposes." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 202–03 (3d Cir. 2006) (citing Fed. R. Civ. P. 15(c)). Under Rule 15(c), an amendment relates back to the original complaint if (1) the claims in the amended complaint arise out of the same transaction or occurrence set forth in the original complaint; (2) the party to be brought in by amendment

received notice of the action within 90 days of its institution (the period provided by Rule 4(m)); and (3) the party to be brought in by amendment knew or should have known that the action would have been brought against it but for a mistake concerning its identity. Fed. R. Civ. P. 15(c); *Arthur*, 434 F.3d at 203.

However, when a party seeks leave to amend a pleading after a deadline set by a court order, as is the case here, "the decision whether to allow the amendment is controlled by Rule 16(b)," which states that a scheduling order "may be modified only for good cause and with the judge's consent." *Price*, 737 F. Supp. 2d at 279. Once the deadline in the scheduling order has passed, "the party seeking the amendment is effectively asking the court not only for leave to amend its pleading, but also the scheduling order," which means that the "party's request now implicates the effective administration of justice." *Id.* Accordingly, the party must show "good cause in order to procure the court's consent." *Id.*; *see also Premier Comp Sols., LLC v. UPMC*, 970 F.3d 316, 318 (3d Cir. 2020) (affirming district court's denial of motion to amend because "Rule 16(b)(4) applies once a scheduling-order deadline has passed, and Premier did not show good cause").

Thus, Rule 16 serves as a threshold or gateway—only after a party has shown good cause under Rule 16 does the court turn to Rule 15(a) and consider whether the party's motion to amend its pleading is appropriate under that standard. *See Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 701 (E.D. Pa. 2007) ("[O]nce the pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party must, under Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading."). Then, if a court grants leave to amend under Rule 15(a), Rule 15(c) mandates that the amendment relates back to the

date of the original pleading if the requirements of Rule 15(c) are satisfied. *Arthur*, 434 F.3d at 203–04; *cf. id.* (explaining that if the district court found that the plaintiff had unduly delayed in requesting leave to amend, it should have vacated its prior order granting leave to amend and struck the amended complaint, and implying that then it need not have considered whether relation back was proper under Rule 15(c)); *Perlman v. Univ. Restoration Sys., Inc.*, Civil Action No. 09-4215, 2013 WL 5278211, at *4 n.5 (E.D. Pa. Sept. 19, 2013) ("[B]ecause the Court denies the request for leave to amend based solely on Rule 15(a), it does not reach any statute-of-limitations or relation-back issues.")

### B. *Rule 16 Analysis*

Despite Doe's misguided belief to the contrary (*see* Doc. No. 36 (failing to mention Rule 16 or good cause) & Doc. No. 39 at p. 5 (stating that there is "no rule 16 issue" because "there is good cause for entry of the SAC")), Rule 16's good cause standard applies to Doe's Motion to File a Second Amended Complaint. Because the deadline for amending the pleadings was March 30, 2020 and the deadline for renaming, adding, or removing named parties was May 13, 2020, and Doe did not file her Motion for Leave to File a Second Amended Complaint until May 22, 2020, we will analyze the Motion under Rule 16 before turning to Rule 15. *See Premier Comp Sols., LLC*, 970 F.3d at 319 ("Before addressing Premier's arguments on appeal, we take this opportunity to clarify that when a party moves to amend or add a party after the deadline in a district court's order has passed, the 'good cause' standard of Rule 16(b)(4) of the Federal Rules of Civil Procedure applies."); *Chancellor*, 501 F. Supp. 2d at 701 ("[O]nce the pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party must, under Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading.").

Under Rule 16, the party moving to amend must demonstrate "good cause" for amending the scheduling order deadline. "'Good cause' under Rule 16(b) focuses on the diligence of the party seeking the modification of the scheduling order." *Price*, 737 F. Supp. 2d at 279; *see also* Fed. R. Civ. P. 16, advisory committee's note to 1983 amendment ("[T]he court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension."); *Premier Comp Sols., LLC*, 970 F.3d at 319 ("[W]e have repeatedly recognized — and we reaffirm today — that whether 'good cause' exists under Rule 16(b)(4) depends in part on a plaintiff's diligence."). If the moving party "knows or is in possession of the information that forms the basis of the later motion to amend" before the deadline has passed, "the party is presumptively not diligent." *Price*, 737 F. Supp. 2d at 280. "Carelessness, or attorney error . . . is insufficient to constitute 'good cause' under Rule 16(b)." *Chancellor*, 501 F. Supp. 2d at 701–02.

The proposed second amended complaint includes, *inter alia*, substituting named parties for the Richard Roes and John Does, additional factual allegations about the February 20 incident, a number of constitutional claims, and reinstating a Title II ADA claim that had previously been pled and then withdrawn. (*See generally* Doc. No. 36-1.) Therefore, we must look to whether Doe has carried her burden of showing that this information was not discoverable, with diligence, before the amendment deadlines.

She has not. In her motion, Doe makes clear that the proposed amendments are based on Defendants' initial disclosures and Defendants' contributions to the parties' Joint Discovery Plan (Rule 26(f) report). (*See* Doc. No. 36 at p. 4 ("The SAC's factual allegations have been deepened and detailed as a result of the Defendants' Initial Disclosures."); *id.* at p. 5 ("Defendants' Initial Disclosures, dated March 12, 2020, provided the detail for the SAC,

15

including the naming of Richard Roe Defendants. Defendants' Description of the Facts and Law, supplied to this Court in the Joint Discovery Plan dated March 10, 2020, also provided more detail[.]"); *see also* Doc. No. 39 at p. 46 ("[P]lease answer my question with regard to the named security personnel and police officers as well as the anesthesiologist from your initial disclosures. I am preparing a new complaint naming them as defendant [sic] based on your initial disclosures."); *id.* at p. 2 ("On March 13, during the conference before the Court, Plaintiff's counsel . . . said she was working on a revamped privacy claim in light of the identification, in the March 12, 2020 Initial Disclosures to Plaintiff, of named Penn Police Officers who would be state actors.").) Here, by Doe's own admission, the initial disclosures and Joint Discovery Plan were provided to her on March 12, 2020 and March 10, 2020, respectively—*before the scheduling order was even issued*.

Undoubtedly, Doe had the information she needed to set forth her proposed amendments to her complaint before the March 30 and May 13 deadlines expired.[8] Therefore, the Court cannot find that Doe has met her burden of showing good cause. *See, e.g.*, *Weisberg v. Weisberg*, Civil Action No. 2:19-cv-3521, 2020 WL 4015239, at *1 (E.D. Pa. July 16, 2020) (denying the defendant's motion to amend his answer and assert counterclaims because it was filed six weeks after deadline for adding new parties and the defendant failed to explain "how he

---

[8] Doe also claims that the amendments are meant to cure defects that Defendants pointed out in their motion to dismiss. In other words, Doe bases some of the proposed amendments off of Defendants' challenges to her amended complaint. (*See, e.g.*, Doc. No. 36 at pp. 6–7 "(Another example is the Privacy claim in the Amended Complaint currently under challenge in Defendants' Motion to Dismiss. Plaintiff has done exactly what Defendants said should be done to amend . . . Plaintiff did exactly that and split her privacy claim into two claims—one based in seclusion and one based in the privacy of the naked body[.]"; *see also id.* at pp. 7–8.) But this does not show good cause either and is on even shakier ground than the amendments based off of the initial disclosure and Rule 26(f) report—after all, Defendants' partial motion to dismiss was filed on November 7, 2019 (*see* Doc. No. 23), *over six months before Plaintiff filed her motion for leave to file a second amended complaint*. To the extent Plaintiff wanted to address the issues raised in Defendants' partial motion to dismiss, she could have, and should have, moved to amend earlier.

was unable, with diligence, to [find the allegedly new] information before the deadline in the Court's Scheduling Order"); *Michaux v. Temas*, 2:17-cv-01241-JFC, 2019 WL 6606110, at *4 (W.D. Pa. Dec. 5, 2019) ("The court concludes that plaintiffs failed to meet the good cause requirement or demonstrate that they acted with due diligence in this case. Plaintiffs did not articulate any reason for waiting over a year to seek to amend the complaint to assert facts gleaned from the photographs produced in defendants' initial disclosures.").

The cases on which Doe relies in her reply brief are inapposite.[9] (*See* Doc. No. 39 at pp. 5–6.) *See Cardone Indus., Inc. v. Honeywell Int'l, Inc.*, Civil Action No. 13-4484, 2014 WL 3389112, at *3 (E.D. Pa. July 11, 2014) (finding good cause for the defendant to amend its counterclaims where "the twelve documents identified by the defendant" as "provid[ing] facts in support of the proposed counterclaims" were produced towards the close of discovery); *Stewart v. Emmons*, Civil Action No. 12-1509, 2014 WL 1281190, at *2 (E.D. Pa. Mar. 27, 2014) (finding that the plaintiff met his burden of showing good cause where neither party disputed the plaintiff's contention that he had good cause to amend his complaint after the January 2013 deadline and the factual basis of the second amended complaint could not have been known until discovery was exchanged in early February 2013); *Clark v. Blackfoot-Bey*, Civil Action No. 10-2683, 2012 WL 5383321, at *4–5 (E.D. Pa. Nov. 1, 2012) (finding good cause for the plaintiff to amend her complaint to name Fannie Mae as a defendant where the plaintiff discovered Fannie Mae's involvement during a deposition, and emphasizing "the complexity of the discovery

---

[9] In any event, the Court notes that Doe moved solely under Rule 15 (*see* Doc. No. 36 at p. 1 ("Plaintiff's Motion for Leave to Amend under Rule 15")) and did not mention Rule 16 until her reply (*see* Doc. No. 39). As such, Doe has waived any argument under Rule 16. *See Premier Comp Sols., LLC*, 970 F.3d at 319 ("In its motion, Premier relied solely on Rule 15(a); it did not address Rule 16(b)(4) except in reply to UPMC. So the District Court was entitled to find Premier forfeited its argument under Rule 16(b)(4).").

process in this case, and the difficulty in making determinations of ownership of various loan assets"). Again, the two documents Doe identifies as providing facts in support of her proposed amendments—the initial disclosures and Rule 26(f) report—were produced over two weeks before the March 30 deadline and over two months before the May 13 deadline for renaming or adding parties.[10]

In addition, Doe's contention that Defendants cannot "believably" show prejudice is immaterial to our Rule 16 analysis. *See Harbor Laundry Sales, Inc. v. Mayflower Textile Servs. Co.*, Civil Action No. 09-6259(NLH), 2011 WL 6303258, at *3 (D.N.J. Dec. 16, 2011) ("[T]he absence of prejudice to the non-moving party does not constitute 'good cause' under Rule 16." (citations omitted)).

Last, the Court notes that prior to the expiration of either the March 30 or May 13 deadlines, Doe never asked the Court for an extension of the deadline for amending the complaint.[11] *See Harbor Laundry Sales, Inc.*, 2011 WL 6303258, at *5 ("Judge Williams'

---

[10] This is the death knell for Doe's motion and distinguishes the matter before us from the motion to amend in *White v. Bush*, a case Doe's attorney referenced during oral argument (which this Court held on Defendants' motion to dismiss and where the issue of Doe's pending motion to amend briefly arose). In *White*, this Court held that the plaintiff had shown good cause under Rule 16 to reopen the deadline for amending his complaint because "[m]ost—if not all—of the new information added to the proposed second amended complaint was not discoverable before the amendment deadline." Civil Action No. 20-2059-KSM, 2021 WL 2255981, at *5 (E.D. Pa. June 3, 2021). The Court found that the *White* plaintiff had been diligent because his amendments were based on information he acquired from Defendants' responses to his interrogatories and document requests as well as from two depositions, none of which occurred *until after the amendment deadline*. This is markedly different from the instant case, where Doe claims that her amendments are based on Defendants' initial disclosures and Rule 26(f) report, all of which she received *before* the amendment deadlines expired in this case.

[11] On May 11, 2020, Defendants' attorney wrote a letter to the Court noting that the parties were having difficulties complying with the Court's policy for setting aside dates for depositions. (Ltr. from L. Greenspan to Judge Marston (May 11, 2020).) In addition, counsel stated that Doe's attorney had requested that Defendants agree to "restart" the discovery deadlines and noted Defendants' opposed any such request. (*Id.*) Doe's attorney responded in an email to the Court outlining Doe's reasons for requesting the "restart" of discovery deadlines. Doe's attorney did not request an extension to file the Second Amended Complaint. Rather, Doe's attorney stated, "We are preparing a Second Amended Complaint which should obviate Defendants' objections to the Amended Complaint, and that should be

finding that Plaintiff failed to make a sufficient showing of good cause under Rule 16 where Plaintiff neglected to adequately explain its inability to file the motion to amend before the September 10, 2011 deadline, or at least request a timely extension of that deadline, was not clearly erroneous or contrary to law."); *Adams v. Republic Servs., Inc.*, Civil No. 12-267-RMB-KMW, 2014 WL 12610152, at *2 (D.N.J. Sept. 16, 2014) ("Good cause may be lacking . . . where a party fails to seek an extension to the deadline.")

Because the Court finds that Doe did not show good cause under Rule 16, we need not analyze whether amendment is permissible under Rule 15(a) or whether the proposed amendments relate back under Rule 15(c). *See, e.g.*, *Wilson v. AC & S, Inc.*, Civil Action No. 2:08-91879-ER, 2013 WL 1294112, at *1 n.1 (E.D. Pa. Mar. 14, 2013) (finding that the plaintiff had not demonstrated good cause for the amendment under Rule 16 and that, as a result, the court "need not consider whether the interests of justice require allowing an amendment to the complaint [pursuant to Rule 15(a)] or whether the proposed claim for lung cancer would relate back to the original claim [under Rule 15(c)] such that it would be deemed timely"); *accord Reno v. AC & S, Inc.*, Civil Action No. 2:09-60293-ER, 2013 WL 5542032, at *1 n.1 (E.D. Pa. June 25, 2013) (holding that the plaintiff had not shown good cause under Rule 16 and even if good cause had been shown, the defendant would be unfairly prejudiced by amendment under Rule 15 and, as such, "the Court need not consider whether the proposed claim for asbestosis would relate back to the original claim such that it would be deemed timely"); *Held v. AC & S, Inc.*, Civil Action No. 2:10-67814-ER, 2013 WL 5543572, at *1 n.1 (E.D. Pa. June 19, 2013) (same).

---

filed by weeks' end." (Email from J. Chovanes to Judge Marston (May 11, 2020).) At that time, the May 13, 2020 deadline to rename, add or removed parties had not yet expired.

## V. Conclusion

For the foregoing reasons, Doe's Motion for Leave to File a Second Amended Complaint is denied.

An appropriate Order follows.