**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 19-2881-KSM** |
| **THE HOSPITAL OF UNIVERSITY OF PENNSYLVANIA**, **et al.**, | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                          **June 29, 2021**

Plaintiff Jane Doe sued the Hospital of University of Pennsylvania ("HUP"), the Trustees of the University of Pennsylvania (the "Trustees"), the University of Pennsylvania ("Penn"), the University of Pennsylvania Health System ("Penn Health System"), Dr. Octavia Pickett-Blakely, Medical Personnel John Does 1–10, and Penn Police Officers Richard Roes 1–10, after receiving a colonoscopy at HUP and experiencing allegedly discriminatory treatment during her post-procedure recovery.  (Doc. Nos. 1 & 19.)  Doe, a transgender ("trans") woman and HUP employee, alleges that she has a sensitivity to anesthesia and became disoriented after her procedure, and that the Penn Police Officer Defendants restrained her, threw her into a wheelchair, handcuffed her, and wheeled her—topless—through the hospital, leaving her on the street.  (*Id.*)

Presently before the Court is the Trustees, HUP, Penn Health System, and Dr. Pickett-Blakely's (the "Penn Defendants'") partial motion to dismiss.  (Doc. No. 25.)  For the reasons discussed below, Defendants' motion is granted in part, and denied in part.

## I.    Factual Background

Accepting all allegations in the amended complaint as true, the relevant facts are as follows.

Jane Doe is a transgender woman.  (Doc. No. 19 at ¶¶ 1, 39.)  Doe has been diagnosed with gender dysphoria ("GD").  (*Id.* at ¶ 47.)  According to the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, ("DSM-V"), GD is a diagnosis "'associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning' for the trans person."  (*Id.* at ¶ 44.)  Trans individuals are diagnosed with GD when they experience "clinically significant distress" associated with being trans.  (*Id.* at ¶ 45.)

Doe was a Certified Nursing Assistant ("CNA") at HUP and was "out as a trans woman" at HUP.  (*Id.* at ¶ 1.)  Doe participated in an LGBT employee group providing education and policy guidance for the treatment of LGBT individuals at HUP.  (*Id.*)

On February 20, 2018, Doe went to HUP as a patient for a routine diagnostic colonoscopy, and Dr. Pickett-Blakely was the doctor in charge of her care.  (*Id.* at ¶¶ 2, 28, 53.)  Doe's friend, Mary Roe, accompanied Doe to HUP that day.  (*Id.* at ¶ 53.)  When Doe and Roe arrived and checked Doe in at the reception desk, the receptionist used Doe's old male name and used masculine pronouns to refer to her, despite the fact that Doe's current name was correct in the system.  (*Id.* at ¶¶ 4, 55.)  In doing so, the receptionist misgendered Doe and ignored HUP policy.  (*Id.*)  And this was not the end of the matter; rather, Doe continued to be misgendered and addressed by her old male name throughout the time she was at HUP for her colonoscopy, despite the fact that Doe and Roe repeatedly corrected the staff.  (*Id.* at ¶ 67.)

Doe has a sensitivity to anesthesia.  (*Id.* at ¶ 5.)  Doe and Roe informed Defendants that Doe's recovery needed to be handled properly and provided specific instructions regarding her

sensitivity to anesthesia and the nature of her post-procedure anesthesia recovery. (*Id.* at ¶¶ 5, 54.) Defendants ignored Doe's warnings and instructions. (*Id.* at ¶ 5.) As a result, when Doe woke up in the recovery room, she was disoriented and agitated. (*Id.* at ¶¶ 6, 57.) Doe did not know where she was and panicked. (*Id.* at ¶¶ 8–9.)

Defendants failed to provide Doe with any medication to treat her agitation and disorientation, even though it had been requested by the on-site doctor. (*Id.* at ¶ 7.) They also ignored Doe's escalating panic. (*Id.* at ¶ 8.) Doe's agitation increased when she was ignored, so she climbed out of bed and stood, seeking help. (*Id.* at ¶¶ 8, 57.) But even in the face of this, Defendants continued to ignore her and failed to provide any medical treatment. (*Id.* at ¶ 57.)

The situation continued to escalate. (*Id.* at ¶ 9.) Standing in her recovery room, partially naked, with no hospital gown on, Doe screamed and begged for help, to no avail. (*Id.* at ¶¶ 58–59, 63.) Eventually, Doe tried to leave but was restrained. (*Id.* at ¶ 9.) Doe fought back. (*Id.*) The Penn police arrived, forcibly entering the room. (*Id.* at ¶¶ 10, 61.) When the police officers closed in on a disoriented Doe, she panicked even more (*see id.* at ¶¶ 61–62) and experienced a flashback to a rape incident she had suffered years earlier (*id.* at ¶ 64). Doe screamed and pled for the men to leave the room. (*Id.* at ¶ 64.)

Doe's pleas were unsuccessful. (*See id.*) Instead, the Police Officer Defendants ganged up on Doe and physically subdued her, dumped her into a wheelchair, held her down, handcuffed her, and wheeled her—still partially naked (topless and shoeless)—through the hospital. (*Id.* at ¶¶ 10, 65–66.) Then the Police Officers Defendants left Doe on the street. (*Id.* at ¶ 10.) During this entire incident, no one offered Doe any medical assistance. (*Id.* at ¶ 9.)

Afterwards, Roe took Doe to another health care institution "to deal with the bruises and wounds she suffered at the hands of Defendants." (*Id.* at ¶ 69.)

Subsequently, Doe's GD flared up and she was unable to return to work at HUP on February 21, 2018, as she has planned to do—which was not only the place the incident took place but also her workplace. (*Id.* at ¶¶ 68, 79.)

The following week, on February 28, 2018, Doe saw a provider, who gave her a note stating that Doe was "unable to work starting Feb 20, 2018 until medical clearance to return to work is granted." (*Id.* at ¶ 70.) On March 22, HUP's Disability Management Office received Doe's request for leave as a reasonable accommodation. (*Id.* at ¶ 71.) On April 6, HUP sent a letter to Doe granting approval of one more week of leave, to April 15, 2018. (*Id.* at ¶ 72.)

On April 12, shortly before her leave expired, Doe informed HUP that she would be requesting her ADA leave be extended for approximately another month and a half, until May 29, 2018. (*Id.* at ¶ 73.) On May 17, HUP notified Doe by letter that her leave would be granted until May 28. (*Id.* at ¶ 74.) HUP informed Doe that "operational needs preclude UPHS from continuing to hold your position for you beyond May 28, 2018" and that her position would be filled if she did not return to work. (*Id.*) On June 7, HUP sent Doe another letter, this time stating that if Doe did not return on June 19, 2018, her employment would be terminated and her position would be filled. (*Id.* at ¶ 75.) Doe did not return to work on June 19, and on June 26, HUP sent her a letter stating that because she did not return, her employment with Penn Health System was terminated. (*Id.* at ¶ 76.) HUP fired Doe on June 28.[1] (*Id.* at ¶ 81.)

Doe claims there was never any discussion of reasonable accommodation for her disability and that Defendants acted with "transphobic hatred." (S*ee, e.g.*, *id.* at ¶¶ 72, 74–78, 80, 90.)

---

[1] Doe's allegations about the date she was fired are inconsistent. (*Compare id.* at ¶ 81 (alleging that HUP illegally fired her on June 28, 2018) *with id.* at ¶ 76 ("On June 26, 2018 HUP sent a letter to Ms. Doe stating that since she did not return on June 19, 2018 her employment with UPHS was being terminated effective June 26, 2018.").)

Ultimately, Doe was unable to seek employment for months after the incident. (*Id.* at ¶ 82.)

A year later, on February 29, 2019, Doe wrote to the Commonwealth of Pennsylvania's then-Secretary of Health, Dr. Rachel Levine for help. (*Id.* at ¶¶ 16, 83.) The state initiated an investigation into HUP's treatment of Doe. (*Id.*) Lorena Renee Cromartie, MSN, BSN, RN—a Health Facility Quality Examiner Supervisor for the Department of Health's Bureau of Facility Licensure and Certification—led the investigation. (*Id.*)

On March 14, 2019, Cromartie provided Doe with a partial update and told her that HUP's Chief Medical Officer, Dr. Neil O. Fishman, admitted that "a number of [HUP's] internal processes have been reviewed and revised based on this incident." (*Id.* at ¶¶ 17, 84.)

Nonetheless, Doe's medical records do not contain any reference to the February 20 incident. (*Id.* at ¶¶ 18, 85.) Doe alleges that HUP and other Defendants falsified Doe's medical records. (*Id.*)

## II.    Procedural History

On April 13, 2019, Doe filed charges of sex and disability discrimination with the Equal Employment Opportunity Commission ("EEOC").[2] (*Id.* at ¶ 33.) The EEOC issued a right to sue letter to Doe on May 13, 2019 (*id.* at ¶ 34), and on July 2, 2019, Doe initiated this action against HUP, the Trustees, Penn, Penn Health System, Dr. Pickett-Blakely, John Does 1–10, and Penn Police Officers Richard Roes 1–10 (*see* Doc. No. 1).

In her original complaint, Doe brought claims for assault, battery, intentional infliction of emotional distress ("IIED"), false imprisonment, violation of the right of privacy, and medical

---

[2] Doe alleges that Defendants disclosed Doe's confidential employment and health information, including HIPAA and other protected information, to the EEOC, in an attempt to breach her anonymity. (*Id.* at ¶¶ 19, 88.)

malpractice against all Defendants. (*Id.* (Counts I–VI).) Doe also claimed that all Defendants discriminated against her on the basis of her sex, in violation of Title VII of the Civil Rights Act ("Title VII"), and that all Defendants violated Title III of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. (*Id.* (Counts VII & XI & XII).) Further, Doe claimed that HUP wrongfully terminated her and violated Title I of the ADA. (*Id.* (Counts VIII & IX).) Last, Doe alleged that the Trustees, Penn, and Police Officers Richard Roe 1–10 violated Title II of the ADA. (*Id.* (Count X).)

A few months later, on October 3, 2019, Doe filed an amended complaint. (*See* Doc. No. 19.) When she amended her complaint, Doe removed the medical malpractice claim against all Defendants and added claims for reckless conduct, gross negligence, and negligence against all Defendants. (*See id.* (Counts V–VII).) In sum, Doe brought the following claims against all Defendants: assault, battery, IIED, false imprisonment, reckless conduct, gross negligence, negligence, violation of the right of privacy, sex discrimination in violation of Title VII, violation of Title III of the ADA, and violation of the Rehabilitation Act. (*Id.* (Counts I–IX, XII–XIII).) In addition, Doe continued to assert claims against HUP for wrongfully terminating her and violating Title I of the ADA, but withdrew her claim that the Trustees, Penn, and Penn Police Officers Richard Roe 1–10 violated Title II of the ADA. (*See generally id.*)

Shortly thereafter, on November 7, 2019, Penn Defendants filed a partial motion to dismiss. (*See* Doc. No. 23.) Penn Defendants moved to dismiss Counts V (reckless conduct), VI (gross negligence), VII (negligence), VIII (violation of the right to privacy), IX (Title VII sex discrimination), XI (Title I of the ADA), XII (Title III of the ADA), and XIII (Rehabilitation Act). (*Id.*) First, Penn Defendants argue that Doe's negligence-based claims (the negligence, gross negligence, and reckless conduct claims) must be dismissed because they are merely

medical malpractice claims in disguise and Doe cannot circumvent the requirements for a medical malpractice claim (namely, the necessity of filing a certificate of merit) by recasting her claim as sounding in ordinary negligence as opposed to professional negligence. (*Id.* at pp. 8–11.) Second, Defendants assert that Doe's ADA and Rehabilitation Act claims should be dismissed because Doe failed to plead a limitation of a major life activity. (*Id.* at pp. 12–14.) Last, Defendants argue that Doe did not adequately plead a privacy violation. (*Id.* at pp. 15–16.) Doe opposed the motion. (Doc. No. 25.)

On February 27, 2020, this matter was reassigned from the Honorable Mitchell S. Goldberg to the Honorable Karen Spencer Marston. (Doc. No. 28.) This Court held a preliminary pretrial conference on March 13, 2020 (Doc. No. 30), and issued a scheduling order shortly thereafter (Doc. No. 31). On May 22, 2020, Doe filed a Motion for Leave to File a Second Amended Complaint. (Doc. No. 36.) On June 24, 2021, the Court held oral argument on Defendants' partial motion to dismiss.[3]

## III. Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), the court must determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although we must accept as true the allegations in the amended complaint, we are not "compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion

---

[3] During oral argument, the Court briefly addressed Plaintiff's pending Motion for Leave to File a Second Amended Complaint, which Defendants oppose. In a separate memorandum also dated June 29, 2021, the Court denied Plaintiff's motion.

couched as a factual allegation." *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017) (quotation marks omitted).

## IV.     Discussion

### A.     *Negligence, Gross Negligence and Reckless Conduct Claims*

First, the Court considers the Penn Defendants' contention that Doe's negligence, gross negligence, and recklessness claims (Counts V, VI, & VII) are essentially medical malpractice claims in disguise and therefore subject to dismissal because Doe has not filed a certificate of merit.  (Doc. No. 23 at pp. 8–11.)

Under the Pennsylvania Rules of Civil Procedure, a plaintiff must file a certificate of merit within 60 days after filing a complaint that asserts a professional liability claim "based upon an allegation that a licensed professional deviated from an acceptable *professional* standard," such as a medical malpractice claim.  *Smith v. Friends Hosp.*, 928 A.2d 1072, 1074– 75 (Pa. Super. Ct. 2007) (quoting Pa. R. Civ. P. 1042.3(a)); *see also Hasty v. Montgomery*, Civil Action No. 12-4335, 2014 WL 830282, at *8 (E.D. Pa. Mar. 4, 2014).  In other words, if a plaintiff's complaint alleges only ordinary negligence, then a certificate of merit is not required. *See, e.g., Smith*, 928 A.2d at 1076–77.  However, if the complaint raises a professional negligence claim, then a certificate of merit is required.  *Iwanejko v. Cohen & Grigsby, P.C.*, 249 F. App'x 938, 944 (3d Cir. 2007).  The Third Circuit has held that this rule constitutes state substantive law and therefore applies in federal court as well.[4]  *See Liggon-Redding v. Estate of*

---

[4] Doe's contention that "Defendants' argument is novel and unsupported; the only case they offer is based on Pennsylvania procedural rules and was deciding a summary judgment motion" (Doc. No. 25) is misguided.  Not only is Rule 1042.3 a *substantive* rule that applies in federal courts, as noted above, but there are also many cases applying it, including those at the motion to dismiss stage.  *See, e.g.*, *May v. Cash*, Civil Action No. 3:13-CV-00069, 2014 WL 295717, at *5 (W.D. Pa. Jan. 23, 2014) ("As the time for filing an appropriate COM has long passed, to the extent that Plaintiff's claim against Defendant Shedlock could be interpreted as a state law medical professional negligence claim, the motion to dismiss should be granted for failure to comply with Rule 1042.3."); *A.L. v. Eichman*, Civil Action No. 17-357,

*Sugarman*, 659 F.3d 258, 264–65 (3d Cir. 2011); *Nayak v. C.G.A. Law Firm*, 620 F. App'x 90, 94 (3d Cir. 2015).

Accordingly, we must examine the factual averments in Doe's complaint and determine whether she intends to proceed on a medical malpractice theory of negligence or ordinary negligence theory. *See Grossman v. Burke*, 868 A.2d 561, 568–70 (Pa. Super. Ct. 2005); *Ditch v. Waynesboro Hosp.*, 917 A.2d 317, 322 (Pa. Super. Ct. 2007), *aff'd*, 17 A.3d 310 (mem.) (Pa. 2011).

"For a party to prevail in a negligence action, ordinary or professional, the elements are identical:  the plaintiff must establish the defendant owed a duty of care to the plaintiff, that duty was breached, the breach resulted in the plaintiff's injury, and the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009). "Although the basic elements of both causes of action are the same," medical malpractice involves the "unwarranted departure from the generally accepted standards of medical practice resulting in injury to the patient, including all liability-producing conduct arising from the rendition of professional medical services." *Grossman*, 868 A.2d at 566. "A complaint sounding in professional versus ordinary negligence deals primarily with the breach of a professional standard of care." *Merlini*, 980 A.2d at 507. "A critical feature" of a medical malpractice action "is that it turns on 'questions involving medical judgment.'  A complaint sounds in malpractice when the conduct at issue constituted an integral part of the process of rendering medical treatment." *Iwanejko*, 249 F. App'x at 944 (quoting *Ditch*, 917 A.2d at 322).

---

2017 WL 3007801, at *8 (W.D. Pa. July 14, 2017) ("To the extent, however, that Plaintiffs later attempt to assert professional liability claims against Eichment [sic], they will be subject to dismissal with prejudice because Plaintiffs have not filed a certificate of merit."); *cf. Hasty*, 2014 WL 830282, at *9 ("Plaintiff has complied with the requirements of Rule 1042.3(a) as to both Dr. Carillo and CMC. Defendants' request to dismiss the state law medical negligence claim on this basis will be denied.").

For that reason, expert testimony is needed in medical malpractice actions, but not in ordinary negligence actions. *See, e.g.*, *Grossman*, 868 A.3d at 566 ("One of the most distinguishing features of a medical malpractice suit is, in most cases, the need for expert testimony, which may be necessary to elucidate complex medical issues to a jury of laypersons.").

The Pennsylvania Superior Court has repeatedly explained the distinctions between the two types of claims and delineated the following two-part test to determine whether a claim sounds in medical malpractice:

> A medical malpractice claim is distinguished by two defining characteristics. First, medical malpractice can occur only within the course of a professional relationship. Second, claims of medical malpractice necessarily raise questions involving medical judgment. Claims of ordinary negligence, by contrast, raise issues that are within the common knowledge and experience of the [fact-finder]. Therefore, a court must ask two fundamental questions in determining whether a claim sounds in ordinary negligence or medical malpractice: (1) whether the claim pertains to an action that occurred within the course of a professional relationship; and (2) whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience. If both these questions are answered in the affirmative, the action is subject to the . . . requirements that govern medical malpractice actions.

*Grossman*, 868 A.2d at 570; *Ditch*, 917 A.2d at 322; *Smith*, 928 A.2d at 1075–76. The Superior Court has also found that "the hiring, training, supervising, and monitoring of employees who assist with the care and treatment of a health care professional's patients is . . . an integral part of providing professional services." *Ditch*, 917 A.2d at 322.

In *Ditch v. Waynesboro Hospital*, an estate brought a negligence action against the defendant Waynesboro Hospital on behalf of the decedent, who had been a patient at the hospital. According to the complaint, the patient suffered a stroke, was transported to the hospital, and then seen in the emergency department. *Id.* at 322. When a hospital employee transported the patient from the emergency room to another room in the hospital "for further treatment," the employee allegedly did not properly restrain the patient and left her unattended,

resulting in the patient falling. *Id.* at 322–23. The estate likened the matter to a "slip-and-fall" case and claimed it asserted an ordinary negligence action. *Id.* at 323. But the Superior Court disagreed and instead affirmed the trial court's determination that the estate had raised a professional negligence claim. *Id.* In its decision, the Superior Court emphasized that: (1) the patient had been at the hospital to receive medical treatment for her stroke; (2) "[i]t was during the course of treatment that someone in emergency room with medical knowledge made the decision to transport [the patient] to a regular hospital room"; and (3) the decision was made to transport her without restraints. *Id.* Taken together, the Superior Court held that "these decisions and actions were an integral part of providing medical treatment and, on some level, implicate[d] medical judgments." *Id.*

Likewise, in *Grossman v. Barke*, an estate sued the decedent's doctor for negligence. 868 A.2d at 563–564. The patient was elderly, severely overweight, and diabetic, and fell off the doctor's examining table during a dizzy spell while she was waiting for the doctor to remove sutures from her ankle. *Id.* The defendant moved for summary judgment, arguing that the estate's claim must be dismissed because medical negligence claims required supportive expert testimony, of which there was none. *Id.* at 565. The trial court granted summary judgment to the defendant and the Superior Court affirmed, holding that the plaintiff was intending to proceed on a medical malpractice theory of negligence, as opposed to an ordinary theory of negligence. *Id.* at 570–71 ("[T]he trial court did not err by characterizing plaintiff's theory of liability as medical malpractice.").

In conducting its analysis, the Superior Court thoroughly examined the complaint, noting that the estate alleged that: the patient's injuries were a result of the doctor's "failure to provide medical assistance . . . within a reasonably expected standard of care," that the patient had gone

to the doctor's office to obtain a pre-examination for a knee replacement, and that the doctor had instructed the patient "to get on the examination table in preparation for the medical service he was to render, *i.e.*, removal of her sutures." *Id.* Such facts indicated to the Superior Court that the patient was only present at the doctor's office "to obtain medical services from him." *Id.* at 571.

Moreover, the plaintiff in *Grossman* had alleged that the doctor instructed her to climb up on the table despite knowing "her age, weight, lack of dexterity and mobility" and knowing that "she was likely to lose her balance due to dizziness caused by her diabetes." *Id.* The Superior Court reasoned that the plaintiff's "assertion of liability based on [the defendant's] professional knowledge, as a physician, of his patient's condition, which requires consideration of certain complex medical factors including an alleged history of dizzy spells due to diabetes" was "telling" and "certainly" showed that the issues implicated the defendant's medical judgment. *Id.*

As the standard makes clear, however, not all negligence claims involving hospitals or the health care system sound in medical malpractice. For example, in *Smith v. Friends Hospital*, the plaintiff filed a complaint alleging that she had been sexually assaulted and beaten by hospital employees while she was hospitalized. 928 A.2d at 1073–74. She sought to hold the hospital liable on a theory of corporate negligence. *Id.* at 1074. The Superior Court held that the plaintiff asserted an ordinary negligence claim, reasoning:

> [The plaintiff's] cause of action is based **only** on her allegations that while hospitalized, she was sexually assaulted and beaten. [The plaintiff's] allegations against the Hospital center **only** around claims that the Hospital failed to properly employ and supervise the individual [defendants], who allegedly perpetrated the sexual and physical assaults on [the plaintiff], and that the Hospital failed to create an environment where such acts could not occur . . . *Thus, although [the plaintiff's] claims pertain to an action that occurred within the course of a professional relationship, they clearly do not raise questions involving medical*

*judgment beyond the realm of common knowledge and experience.*

*Id.* at 1076 (emphasis added). And in *Geleano v. Susquehanna Health System*, the Superior Court held that the plaintiff merely asserted "garden-variety negligence claims," even though the defendant had fallen at the defendants' medical facility. No. 1182 MDA 2016, 2017 WL 2197007, at *6 (Pa. Super. Ct. 2017). The Superior Court reasoned that the plaintiff had fallen after his physical therapist had evaluated him and while he was making his way towards the building's exit, and therefore "not in the course of treatment or any professional relationship with [the defendants]." *Id.*

Although Doe alleges that she was assaulted and battered while she was hospitalized, like the *Smith* plaintiff, Doe's complaint is different from the *Smith* plaintiff's in a key way: namely, a close review of Doe's allegations show that the actions took place in the course of a professional relationship *and* raised questions involving medical judgment.

In her reckless conduct, gross negligence, and negligence counts against all Defendants, Doe asserts that Defendants owed "duties to [her], including but not limited *to treating her sensitivity to anesthesia competently*, respecting the information she conveyed regarding her recovery, *treating the difficult recovery completely* and to do all that without further harming her or destroying her employment." (Doc. No. 19 at ¶¶ 109, 113, 117 (emphasis added).)[5] These allegations indicate that Doe is relying on a professional standard of care. This is so because an ordinary, non-medical professional would not have a duty to treat Doe's sensitivity to anesthesia completely or treat her difficult recovery completely. Treating a patient's sensitivity to

---

[5] Notably, these allegations are *practically identical* to the allegations Doe set forth in her original complaint on her medical malpractice claim. (*Compare id.*, *with* Doc. No. 1 at ¶ 111 ("Defendants owed a professional duty and duties to Ms. Doe, including but not limited to treating her sensitivity to anesthesia competently, treating the difficult recovery completely and to do all that without further harming or destroying her employment.").)

anesthesia necessarily implicates questions of medical judgment and transcends common knowledge or experience. Likewise, Doe's allegations that Defendants failed to diagnose and treat her sensitivity to anesthesia call for expert testimony.

Moreover, Doe's allegations illustrate that she conveyed the information regarding her post-procedure recovery to medical professionals for the purpose of obtaining proper medical treatment. (*See id.* at ¶ 54 ("[Doe] and Ms. Roe had informed Defendants that her recovery needed to be handled properly, including post procedure anesthesia recovery."); *id.* at ¶¶ 5, 56 ("HUP and the other Defendants . . . ignored Ms. Doe's specific instructions regarding her sensitivity to anesthesia and the nature of her post-anesthesia recovery, and failed to treat her accordingly.").) In addition, Doe alleged that "HUP and the other Defendants then failed to provide Ms. Doe with any medication to treat her disorientation." (*See id.* at ¶ 7.) Taken together, Doe's allegations indicate that she is pursuing a theory of liability based on medical malpractice, not ordinary negligence.

Furthermore, as in *Grossman*, it is telling that Doe alleged that the incident took such a dark and traumatizing turn "all because Defendants had failed to heed her directions regarding anesthesia — *directions incidentally, that they should have been aware of without specific instructions*." (*Id.* at ¶ 66 (emphasis added).) Like the plaintiff in *Grossman*—who alleged that her doctor knew her medical history and that she was likely to lose her balance and become dizzy and therefore breached his duty of care in instructing her to climb up on the exam table— Doe invokes the Penn Defendants' "professional knowledge" of their "patient's condition, which requires consideration of certain complex medical factors including" an alleged history of sensitivity to anesthesia. 868 A.2d at 571. In other words, Doe is alleging that in light of Defendants' medical background, they should have been aware of how to respond to a patient

experiencing sensitivity to anesthesia without having to be told or receiving instructions from the patient first. This, too, shows that the issues raised in Doe's negligence, gross negligence, and reckless conduct claims implicate Defendants' medical judgment.

Because Counts V, VI, & VII of Doe's complaint sound in medical malpractice, rather than ordinary negligence, and because she did not file the requisite certificate of merit, we grant Penn Defendants' motion to dismiss as to those claims.[6]

###  B.      ADA and Rehabilitation Act Claims

Next, we address Penn Defendants' contention that Doe's ADA (Counts XI & XII) and Rehabilitation Act (Count XIII) claims must be dismissed because Doe fails to plead that she has been limited in one or more major life activities. (*See* Doc. No. 23 at pp. 12–23.)

The ADA mandates that "an employer cannot discriminate against a qualified individual with a disability because of his disability with regard to his employment." *McCall v. Carbon Schuylkill Community Hosp., Inc.*, Civil Action No. 3:19-2052, 2020 WL 5232393, at *3 (M.D. Pa. Sept. 2, 2020) (citing 42 U.S.C. § 12112). To state an ADA discrimination claim, a plaintiff must show that (1) the plaintiff is disabled within the meaning of the ADA, (2) the plaintiff is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) the plaintiff has suffered an otherwise adverse employment decision as a result of the discrimination. *Id.* (citing *Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

Here, Defendants challenge the first element—whether Doe has adequately pled that she is disabled. Under the ADA, "disability" is defined as "(a) a physical or mental impairment that

---

[6] Because the Court dismisses these counts for the foregoing reasons, we do not address the Penn Defendants' alternative argument that the reckless conduct claim should be dismissed because it is not recognized as an independent tort. (*See* Doc. No. 23 at p. 11 n.4.)

substantially limits one or more major life activities of [the] individual; (b) a record of such

impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see

also Doe v. Triangle Doughnuts LLC*, 472 F. Supp. 3d 115, 132 (E.D. Pa. 2020). "'Major life

activities' include but are not limited to 'caring for oneself, performing manual tasks, seeing,

hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

reading, concentrating, thinking, communicating, and working,' as well as the operation of a

major bodily function." *Triangle Doughnuts*, 472 F. Supp. 3d at 132–33 (quoting 42 U.S.C. §

12102(2)).

      "While 'an impairment need not prevent, or significantly or severely restrict, the

individual from performing a major life activity in order to be considered limiting,' it is also the

case that 'not every impairment will constitute a disability' under the ADA." *Id.* at 133 (quoting

29 C.F.R. § 1630.2(j)(ii)). "An individual is substantially limited when she is 'unable to perform

a major life activity that the average person in the general population can perform' or

'significantly restricted as to the condition, manner, or duration under which [she] can perform a

particular major life activity, as compared to the condition, manner, or duration under which the

average person in the general population can perform that same major life activity.'" *Peter v.

Lincoln Tech. Inst., Inc.*, 255 F. Supp. 2d 417, 432 (E.D. Pa. 2002) (quoting 29 C.F.R. §

1630.2(j)(1)).

      We consider Doe's ADA and Rehabilitation Act claims together, since the same

substantive standards apply to both. *See, e.g.*, *Fowler*, 578 F.3d at 208 ("After the ADA went

into effect, Congress amended the Rehabilitation Act by incorporating the ADA's substantive

standards for determining whether a covered employer has engaged in illegal discrimination . . .

The standards for determining whether a covered employer has violated [the Rehabilitation Act]

have been coextensive with the standards for determining whether a covered employer has violated the ADA ever since.").

In this case, Doe has pled that she suffers from GD; that GD "is a medical and therapeutic diagnosis associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning;" and that GD is a disability because "it substantially impairs one or more major life activities, including, but not limited to, neurological, brain, social, and occupational functions." (Doc. No. 19 at ¶¶ 13, 44, 46–47, 49.) Doe also alleges that her GD flared up after the February 20 incident at HUP and she experienced difficulty in returning to her workplace, HUP. (*Id.* at ¶¶ 13, 79.)[7]

"Penn Defendants do not dispute that GD is a recognized medical condition." (*Id.* at p.

---

[7] There is significant disagreement over whether GD constitutes a disability within the meaning of the ADA or whether it falls within one of ADA's categorical exclusions. *Compare Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-04822, 2017 WL 2178123, at *3–4 (E.D. Pa. May 18, 2017) (concluding that GD did not fall within the ADA's categorical exclusion for gender identity disorders and explaining that "it is fairly possible to interpret the term gender identity disorders narrowly to refer to simply the condition of identifying with a different gender, not to exclude from ADA coverage disabling conditions that persons who identify with a different gender may have—such as [the plaintiff's] gender dysphoria, which substantially limits her major life activities of interacting with others, reproducing, and social and occupational functioning"), *Triangular Doughnuts*, 472 F. Supp. 3d at 134–35 ("The Court recognizes the dynamic nature of both the legal and medical precedent with respect to issues surrounding 'transgenderism,' 'gender identity,' and 'gender dysphoria.' In light of that dynamism, the Court declines at this stage of the proceeding to dismiss Doe's hostile work environment claim under the ADA based on her alternative theories of disability related to either gender dysphoria or some other neuroanatomical disability related to her gender identity."), *and Venson v. Gregson*, Case No. 3:18-CV-2185-MAB, 2021 WL 673371, at *2–3 (S.D. Ill. Feb. 22, 2021) ("As for Defendants' argument that gender dysphoria is excluded from the definition of disability under the ADA, this issue is not nearly as straightforward as Defendants let on . . . Given the unsettled state of the law . . . the Court cannot state for certain that gender dysphoria falls within the ADA's exclusionary language), *with Williams v. Kincaid*, Civil Action No. 1:20-cv-1397, 2021 WL 2324162, at *2 (E.D. Va. June 7, 2021) (concluding that the plaintiff's gender dysphoria fell within the ADA's categorical exclusion for gender identity disorders because the plaintiff failed to allege "some physical impairment that resulted in her gender dysphoria"), *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 753–54 (S.D. Ohio 2018) (same), *and Doe v. Northrop Gunman Sys. Corp.*, 418 F. Supp. 3d 921, 930 (N.D. Ala. 2019) (same).

However, this Court need not address whether the ADA gender identity exclusion categorically bars Doe's claim, given that Penn Defendants did not raise the issue in their motion. (*See generally* Doc. No. 23.)

13.)  According to Penn Defendants, "the dispute lies in Plaintiff's failure to assert the limitations that she claims she suffers as a result of her alleged GD."  (*Id.*)  In arguing that Doe has failed to plead an impairment of a major life activity, Penn Defendants attempt to distinguish *Blatt v. Cabela's Retail, Inc.*, where the plaintiff alleged that she was diagnosed with gender dysphoria, "which substantially limit[ed] one or more of her major life activities, including, but not limited to interacting with others, reproducing, and social and occupational functioning." *Blatt*, 2017 WL 2178123, at *2.  (*See* Doc. No. 23 at pp. 13–14 ("Unlike the Plaintiff in *Blatt*, who specifically alleged limitations to interacting with others, reproducing, and social and occupational functioning, Plaintiff, in this case, asserts 'Ms. Doe is a person with a disability within the definition of the ADA and the Rehabilitation Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity,' without identifying what that limitation is.").)

Although a close call, this Court finds that Penn Defendants fail to draw all inferences in Doe's favor and construe her complaint too narrowly.  Although *Lange v. Houston County*, 499 F. Supp. 3d 1258 (M.D. Ga. 2020), dealt with a different legal issue—namely, whether the plaintiff's GD fell within the ADA statutory exclusion for gender identity disorders—and is out-of-circuit, *Lange* is instructive in showing the importance of drawing all inferences in the plaintiff's favor.  There, the plaintiff alleged that she had "gender-dysphoria," which is "defined in the [DSM-5] as a condition characterized by marked incongruence between one's gender assigned at birth and one's internal sense or experience of gender, which results in clinically significant distress."  *Id.* at 1270.  The plaintiff also alleged that her gender dysphoria "result[ed] from physical impairments" and that "gender dysphoria derives from an atypical interaction of the endocrine and neurological systems, which results in the person being born with external sex

characteristics and hormones that are inconsistent with the person's gender perception." *Id.* The defendants argued that the "general allegation about the causes of gender dysphoria [did] not allege that *Lange's own* dysphoria was caused by an atypical interaction of the endocrine and neurological systems." *Id.* In other words, like Penn Defendants in this case, the *Lange* defendants argued that the plaintiff's general allegations about those who suffered from GD did not suffice because they did not specifically mention the plaintiff herself, *even though the plaintiff herself had been diagnosed with GD*.

The *Lange* court rejected the defendants' contention. The court explained: "[I]f Lange is alleging (i) that gender dysphoria results from a physical impairment and (ii) that she has gender dysphoria, then it follows that (iii) her dysphoria results from a physical impairment. Certainly, if this issue were addressed at the summary judgment stage, those allegations might receive more scrutiny . . . As a matter of pleading, Lange clearly alleges that she has a condition that results from physical impairment." *Id.*

Applying the *Lange* court's logic, this Court finds here that Doe has sufficiently pled that she suffered limitations of the major life activities to survive a motion to dismiss. Doe alleges that (i) she has gender dysphoria, (ii) "GD is a medical and therapeutic diagnosis 'associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning' for the trans person," (iii) "[t]rans people are diagnosed as suffering from GD when they have 'clinically significant distress' associated with being trans," and (iv) "GD is a disability in that it substantially impairs one or more major life activities, including, but not limited to, neurological, brain, social, and occupational functions." (Doc. No. 19 at ¶¶ 44–47.) Therefore, it follows that (v) Doe's GD substantially impairs her social, occupational, neurological, or brain functions.

In any event, even setting aside Doe's more general allegations about trans people who suffer from GD and the impairments they face, the Court observes that Doe has made at least one specific allegation that, when viewed in the light most favorable to her, allows us to draw the inference that GD substantially limited Doe's occupational functioning. Specifically, Doe alleges that, after the incident, her "GD flared up and she experienced difficulty in returning to HUP, her workplace." (*Id.* at ¶ 79.) Although Doe must prove far more to survive a future summary judgment motion, we find that this is sufficient for her ADA and Rehabilitation Act claims to withstand a motion to dismiss. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 213–14 (3d Cir. 2009) ("Fowler is not required, at this early pleading stage, to go into particulars about the life activity affected by her alleged disability or detail the nature of her substantial limitations. Her complaint identifies an impairment, of which UPMC allegedly was aware and alleges that such impairment constitutes a disability under the Rehabilitation Act . . . Of course, Fowler must ultimately prove that she is substantially limited in a recognized major life activity to prevail on her claim. At the pleading stage, however, Fowler's allegation regarding disability is sufficient. This is so even after *Twombly* and *Iqbal.*").

### C.      State Law Privacy Claim

Last, the Court turns to Penn Defendants' argument that Doe's privacy claim (Count VIII) must be dismissed. (Doc. No. 23 at pp. 15–16.)

In Pennsylvania, four distinct torts fall under the umbrella of an action for invasion of privacy: (1) intrusion upon seclusion; (2) appropriation of name or likeness; (3) publicity given to private life, and (4) publicity placing the person in a false light. *Boring v. Google, Inc.*, 362 F. App'x 273, 278 (3d Cir. 2010) (citing *Burger v. Blair Med. Assocs. Inc.*, 964 A.2d 374, 376–77 (2000)); *Harris by Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984)

(citations omitted). Although it is not obvious from Doe's amended complaint (*see* Doc. No. 19), in her response brief, Doe clarifies that her privacy claim is premised upon the first and third torts, intrusion upon seclusion and publicity given to another's private life (*see* Doc. No. 15 at p. 15). We address each in turn.

### i. *Intrusion upon Seclusion*

Under Pennsylvania law, which follows the Restatement (Second) of Torts, a claim for intrusion upon seclusion arises when one "intentionally intrudes, physical or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." *Harris by Harris*, 483 A.2d at 1383 (citing Restatement (Second) of Torts § 652B); *see also Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 537 (3d Cir. 2018); *Boring*, 362 F. App'x at 278–79 ("To state a claim for intrusion upon seclusion, plaintiffs must allege conduct demonstrating 'an intentional intrusion upon the seclusion of [her] private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities.'" (quoting *Pro Golf Mfg., Inc. v. Tribune Rev. Newspaper Co.*, 809 A.2d 143, 247 (Pa. 2002))).

"The invasion may be 1) by physical intrusion into a place where the plaintiff has secluded himself, 2) by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or 3) some other form of investigation or examination into plaintiff's private concerns." *Harris by Harris*, 483 A.2d at 1383 (citing Restatement (Second) of Torts § 652B, comment b). Publicity is not required. *Boring*, 362 F. App'x at 279; *Harris by Harris*, 483 A.2d at 1383. Courts may consider whether the conduct at issue is "'highly offensive' as a matter of a law at the pleading stage." *Boring*, 362 F. App'x at 279.

Notably, "[e]ven in a public place, . . . there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters." *Harris v. Midas*, Civil Action No. 17-95, 2017 WL 3440693, at *4 (W.D. Pa. Aug. 10, 2017) (citing Restatement (Second) of Torts § 652B, comment c); *accord Bohenkamp v. Whister*, Case No. 1:19-cv-00115-RAL, 2021 WL 1947248, at *7 (W.D. Pa. May 14, 2021) (explaining that "there is no requirement in Pennsylvania case law that the only actionable intrusions occur at home, school, or work" and noting that "acts 'conducted in a public or semi-public place, may nevertheless rise to the level of invasion of privacy based on intrusion upon seclusion'" (citation omitted)). For example, "courts have held that viewing an individual's private body parts without his or her consent can constitute an intrusion upon seclusion." *Harris*, 2017 WL 3440693, at *4 (collecting cases); *see also id.* ("Here, Plaintiff alleges that Shick forced her into a chair, pulled her shirt away from her body, looked at her breasts and commented on them. Taking these allegations as true, the Court finds that Plaintiff has adequately stated a claim for intrusion upon seclusion.").

To withstand a motion to dismiss on an intrusion upon seclusion claim, a plaintiff must plead sufficient facts to show that the intrusion was intentional. *See, e.g.*, *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 404 (E.D. Pa. 2011). As the Third Circuit has recognized, "an actor commits an intentional intrusion only if he believes, or is substantially certain, that he lacks the necessary legal or personal permission to commit the intrusive act." *Id.* (quoting *O'Donnell v. United States*, 891 F.2d 1079, 1083 (3d Cir. 1989)); *see also Brown v. United States*, Civil Action No. 17-1551, 2018 WL 741731, at *11 (E.D. Pa. Feb. 7, 2018). Put simply, the Third Circuit has "emphasize[d] that the intrusion, as well as the action, must be intentional." *Ruder*, 790 F. Supp. 2d at 404 (citation omitted); *O'Donnell*, 891 F.2d at 1083.

Therefore, absent allegations that the defendants made the intrusion believing that they lacked legal or personal permission to do so, an intrusion upon seclusion claim must fail. S*ee, e.g.*, *Ruder*, 790 F. Supp. 2d at 404–05 (granting motion to dismiss on intrusion upon seclusion claim because the plaintiff had not alleged that the defendants believed that they lacked legal or personal permission to make a disclosure regarding the authenticity of the plaintiff's medical statement); *cf. Yates v. Commercial Index Bureau, Inc.*, 861 F. Supp. 2d 546, 552 (E.D. Pa. 2012) (denying motion to dismiss where the plaintiff "sufficiently alleged that his privacy was intentionally invaded by [the defendant] when it conducted an investigation into his hospital records, which it knew it did not have consent to obtain"); *accord Canada v. Samuel Grossi & Sons, Inc.*, 476 F. Supp. 3d 42, 64–65 (E.D. Pa. 2020) (granting summary judgment on intrusion upon seclusion claim where the evidence showed that at the time the plaintiff's supervisor searched his cell phone, she "believed she had the legal authority to do so as she thought she was searching a company cellphone"); *Bamat v. Glenn O. Hawbaker, Inc.*, No. 4:18-CV-01898, 2019 WL 1125817, at *2 (M.D. Pa. Mar. 12, 2019) (finding that the plaintiff's intrusion upon seclusion claim failed and granting motion for judgment on the pleadings because the plaintiff "alleges no facts in either his complaint or amended complaint allowing a jury to infer that the supervisor believed that he lacked the legal or personal permission to commit the allegedly intrusive act").

When read in the light most favorable to Doe, Doe's complaint pursues two alternative theories for intrusion upon seclusion:  first, that Defendants intruded upon her seclusion by revealing her confidential information to the EEOC, and second, that Defendants intruded upon her seclusion when she was disoriented in the recovery room by sitting on her and wheeling her topless through the hospital.

First, Doe alleges that Defendants breached Doe's privacy through their "unauthorized disclosure of her confidential information to the EEOC." (Doc. No. 19 at ¶ 19; *see also id.* at ¶ 88 ("Defendants have also disclosed Ms. Doe's confidential employment and health information, including HIPAA and other protected information to the EEOC, in their attempt to breach Ms. Doe's anonymity."); *id.* at ¶ 124 ("Defendants further publicized Ms. Doe's private and/or personal facts without serving any legitimate business purpose by the disclosure, most recently, in a breach of her right to privacy through their communications with the EEOC.").) Fatal to this theory, however, is Doe's failure to plead that Defendants knew they lacked legal or personal permission when they provided her personal information to the EEOC. Therefore, to the extent Doe bases her privacy claim on Defendants' unauthorized disclosure to the EEOC, her claim is dismissed.

Second, Doe alleges that she was standing partially naked in her recovery room when the Penn police "forcibly entered," "closed in on" her, and she screamed, "pleading, for the men to leave the room." (Doc. No. 19 at ¶¶ 58, 61, & 64.) In addition, Doe claims that that police officers "ganged up" on her, "threw her into a wheelchair, held her down," handcuffed her, and wheeled her topless through the hospital and onto the street. (*Id.* at ¶¶ 65–66, 10.) Drawing all reasonable inferences in Doe's favor, Doe has adequately pleaded that Defendants committed highly offensive conduct that would cause mental suffering, shame, or humiliation to a person of ordinary sensibilities. Because Doe alleges that the police forcibly entered and that she begged the men to leave the room while she was naked, to no avail, Doe has also sufficiently pled that the police officers did not have her personal permission to commit the intrusion. *See, e.g.*, *Bamont v. Pa. Soc'y for the Prevention of Cruelty to Animals*, 163 F. Supp. 3d 138, 154 (E.D. Pa. 2016) (denying motion to dismiss intrusion upon seclusion claim where the plaintiff pled that

she did not consent to a search of her home).  As such, the Court denies Penn Defendants'

motion to dismiss the privacy claim, to the extent Doe bases it on such behavior.

### ii.      *Publicity Given to Private Life*

To state claim for the tort of publicity given to private life, a plaintiff must allege that

there was: "(1) publicity, given to (2) private facts, (3) which would be highly offensive to a

reasonable person and (4) is not a legitimate concern to the public."  *Harris by Harris*, 483 A.2d

at 154; *Boring*, 362 F. App'x at 280. "The element of 'publicity' requires that the matter is made

public, by communicating it to the public at large, or to so many persons that the matter must be

regarded as substantially certain to become one of public knowledge.  Disclosure of information

to only one person is insufficient."  *Harris by Harris*, 483 A.3d at 1384 (citations omitted).

To the extent that Doe's publicity given to private life claim is based on Defendants'

unauthorized disclosure of her personal health information to the EEOC, Doe's claim must fail

because the EEOC is a single entity.  *See Brown*, 2018 WL 741731, at *11 ("In her complaint,

Plaintiff alleges that the sole recipient of Plaintiff's personal health information was JAB.  As the

element of publicity is not satisfied, this theory cannot survive."); *Johnson v. Lehigh County*, No.

Civ. A. 00-CV-1670, 2000 WL 1507072, at *5 (E.D. Pa. Oct. 10, 2000) ("Plaintiff's allegations

that Defendants' agents revealed her disabilities to one third party, even if true, fail to establish

communication to the public or to so many people that her disabilities would become public

knowledge.  The Court, therefore, concludes that Count V fails insofar as it asserts a claim for

publicity of private facts."); *cf. List v. Jameson Mem. Hosp.*, No. 1457 WDA 2012, 2013 WL

11256398, at *5 (Pa. Super. Ct. Aug. 27, 2013) ("In the instant case, if there were evidence that

the local newspaper had published a story relating Robert List's condition . . . this would

certainly constitute 'publicity' for the purposes of this tort.")

Likewise, to the extent Doe bases her unreasonable publicity given to private life claim on Defendants revealing her partially naked body to the general public, the Court finds that Doe fails to state facts sufficient to satisfy the element of publicity. Doe pleads that the Penn police wheeled her partially naked through the hospital and left her on the street, topless.[8] (*Id.* at ¶ 10, 65–66.) Without question, this constitutes highly offensive conduct. However, without an allegation that members of the public—either in the hospital and/or on the street—viewed Doe's partially naked body, the Court is unable to find Doe has sufficiently pled the element of publicity to survive Defendants' motion to dismiss. *See, e.g.*, *W.P. v. Westmoreland County*, No. Civ. 04-1562, 2005 WL 3447896, at *20 (W.D. Pa. Dec. 14, 2005) ("Here, the only person the foster mother is alleged to have told that the children were foster children was a neighbor . . . Plaintiff also generally alleges that the foster mother 'published to others' that she was the foster mother of the children when she took them to the bus stop. We find that such allegations fail to meet the required element of publication such that the matter becomes public knowledge. Accordingly, we will grant Defendants' motion to dismiss[.]"); *Mariano v. Borough of Dickson City*, Civil Action No. 3:13-0097, 2013 WL 6234622, at *8 (M.D. Pa. Dec. 2, 2013) (granting defendants' motion to dismiss publicity given to private life claim where the plaintiff failed to identify "to whom [the allegedly defamatory statements] were made").

---

[8] Doe also alleges that Penn Defendants are vicariously liable for the acts of the Penn police. (*See* Doc. No. 19 at ¶ 31 ("At all relevant times hereto, all Defendants were acting within the course and scope of their actual and/or apparent agency and employment and Defendants Penn, HUP, Health System, and Trustees are liable for the acts of their agents and employees as set forth below.").)

## V. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Penn Defendants' motion to dismiss.

An appropriate Order follows.